Pauline Porter White, Appellee, v. Robert White, Jr., and Emma Merigold White, Administrator and Administratrix, Respectively, of the Estate of Robert White, Deceased, Appellants.

Gen. No. 36,676.

Matchett, P. J., dissenting.

Heard in the first division of this court for the first district at the April term, 1933. Opinion filed April 30, 1934. Rehearing denied May 14, 1934.

Tolman, Chandler & Dickinson, for appellants.

Moses, Kennedy, Stein & Bachrach, for appellee; Hamilton Moses and Seymour A. Greenblatt, of counsel.

Mr. Justice O'Connor delivered the opinion of the court.

Plaintiff brought suit against the defendants to recover $799.56 which she claimed as a balance due her from rents collected by Robert White, the deceased, in his lifetime, under a written agreement entered into between plaintiff and Robert White, whereby White managed a building belonging to plaintiff. At the time of his death Robert White had in his possession from rents collected by him under the agreement $799.56. The defendants filed an amended affidavit of merits in which they set up that Robert White had not been paid in full for the services he had rendered plaintiff and therefore they were entitled to retain sufficient of the moneys collected by him to pay for the services. Afterward, on plaintiff's motion, defendants' amended affidavit of merits was stricken because it did not set up a legal defense. Defendants elected to stand by their amended affidavit

of merits, and thereupon judgment was entered for plaintiff on her statement of claim, and this appeal followed.

The record discloses that on February 26, 1930, plaintiff and Robert White, who was engaged in the real estate business in Chicago, entered into a written contract whereby Robert White was to manage a building belonging to plaintiff for a period beginning March 1, 1930, and ending December 31, 1934. The contract is set out verbatim in plaintiff's statement of claim. It provided, among other things, that White should manage the building, make leases, collect rents, pay all bills, and retain five per cent of the gross rentals collected by him in payment for his services, turning over the balance to plaintiff.

Upon the execution of the contract White proceeded to manage the building and continued to do so until his death April 25, 1932. He rendered detailed statements to plaintiff as provided by the contract, except for the months of March and April, 1932. During these two months he had collected more than $2,000 in rents and was entitled on account of disbursements made by him to a credit of more than $1,300, leaving in his hands, as plaintiff contends, $799.56.

On the other hand, defendants contend that since White, in his lifetime, had obtained leases which ran for considerable periods of time after his death, he had not been compensated in full for obtaining such leases, and after crediting White for the reasonable value of such services, defendants had in their hands but $67.10 belonging to plaintiff, which they tendered.

Both parties seem to agree that the death of Robert White terminated the agency.

Plaintiff's theory of the case is that under the terms of the contract White was entitled to a commission of five per cent on the gross rentals actually collected by him, and nothing more. Defendants' position is that

while the death of White terminated the agency, there was an implied obligation on the part of plaintiff to pay reasonable compensation for the services rendered by White for obtaining the leases which had not expired at his death. The one substantial question in the case is the construction of the written contract.

The substance of the contract, so far as is necessary to state here, is that plaintiff owned a building known as No. 500–502 South Wells street, Chicago, and employed plaintiff to manage the building for her. He was to have complete and exclusive management and operation of the building from March 1, 1930, to December 31, 1934, a term of four years and ten months, and was authorized to procure tenants, make leases, collect rents, make repairs, pay all bills, etc., and "to retain from the proceeds of the rents . . . a sum or commission equal to five per centum (5%) of the gross amount of all moneys actually paid by or collected from all of the tenants . . . ." And he agreed "to accept the said commission in full payment and consideration for the said services."

The contract further provided that on or before the 5th of each month White should render to plaintiff a detailed statement in writing accompanied by receipted vouchers covering all receipts and disbursements made by him during the preceding month, and after deducting five per cent of the gross rentals for his commissions and the disbursements made, pay over the balance to plaintiff. A further provision was, "In the event of the sale of said premises or of a lease of the entire building for a term of ten (10) years or more, then this agency agreement shall be deemed canceled and of no further force and effect . . . ."

"The owner [plaintiff] shall have the right to cancel this agreement as of December 31, 1932, or as of any date thereafter, by giving to the Agent [Robert White] herein sixty (60) days prior written notice of its intention so to do, . . . in which event the Owner shall pay to the Agent herein the regular real estate board

rate of commission for the unexpired portion of any and all leases which shall have been consummated by the Agent herein.''

It seems to be conceded that the contract being personal, the effect of Robert White's death was to terminate the duty of White's personal representatives of going forward with performances, and plaintiff contends that the death of Robert White ''did not nullify the contract in the sense of emancipating his personal representatives from the restraint of its conditions.'' And that since the contract expressly provides that White was to receive for his compensation five per cent per month of the gross rentals collected by him, this is the full extent of plaintiff's liability.

From a careful consideration of the entire contract, we are of opinion that the parties to the contract did not have in mind the contingency of the death of Robert White before the expiration of the period covered by the contract, namely, December 31, 1934. We think it was not contemplated that five per cent of the gross rentals was the extent of White's compensation in all circumstances. This is shown by paragraph 10 of the contract, which provides that plaintiff might cancel the contract December 31, 1932, or at any date thereafter by giving 60 days' notice of her intention so to do, in which event White was to be paid ''the regular real estate board rate of commission for the unexpired portion of any and all leases which shall have been consummated by the Agent.'' This compensation would be in addition to the five per cent retained by Robert White from the collections actually made by him, and indicates that the five per cent was not to be the sole compensation White was to receive if the agency terminated before December 31, 1934.

Where a contract calls for the personal services of one, whose death prevents full performance, his personal representatives are not liable for its performance. *Smith v. Preston,* 170 Ill. 179; *Emerich Outfitting Co. v. Siegel, Cooper & Co.,* 237 Ill. 610. The gen-

eral rule is that a recovery may be had by his representatives for the reasonable value of the services performed unless the contract clearly makes the whole performance a prerequisite to an obligation to pay for any part of the work. 13 Corpus Juris, 642, 643; 2 Corpus Juris, 760; 3 Williston on Contracts, sec. 1973; *Coe v. Smith*, 4 Ind. 79; *Parker v. Macomber,* 17 R. I. 674; *Wolfe v. Howes,* 20 N. Y. 197; *Clark v. Gilbert,* 26 N. Y. 279; *Lauda v. Shooks,* 87 Texas 608; *Matter of Buccini v. Paterno Const. Co.,* 253 N. Y. 256.

In 13 Corpus Juris, pp. 642, 643, it is said: ''Where from the nature of the contract it is evident that the parties contracted on the basis of the continued existence of the person or thing, . . . to which it relates, the subsequent perishing of the person or thing . . . will excuse the performance, a condition to such effect being implied, in spite of the fact that the promise may have been unqualified . . . .''

And in 2 Corpus Juris, 760, it is said: ''Where the death of the agent prevents full performance of the contract on his part, the general rule is that a recovery may be had by his representative on a *quantum meruit* for the services performed.''

And in discussing the question of the recovery for services where full performance is impossible, Prof. Williston, in his clear and lucid work on contracts, says (vol. 3, sec. 1973): ''It would be admitted, however, certainly everywhere in the United States, and perhaps in England, that the employee or his representatives may recover the fair value of any services rendered by him for which, because illness òr death stopped performance, he could not recover on the contract, unless the contract clearly makes the whole performance a prerequisite to the existence of an obligation to pay for any part of the work.''

In *Coe v. Smith, supra* (4 Ind. 79), where an attorney was engaged to defend a suit for an agreed fee and died after partial performance and before the case

was determined, it was held that his administrator might recover from the client for the reasonable value of the services rendered. The court there, in discussing the right of the personal representative of one who died pending the performance of a contract, which had been taken for a specified sum, after discussing the old rule announced by some authorities, that no recovery could be had, said (p. 80): "In some courts, however, this doctrine seems to have been doubted, if not denied. Kent, to the observation above quoted, adds: 'The old rule is now held to be relaxed, and wages, it is understood, may be apportioned upon the principle that such is the reasonable construction of the contract of hiring.' "

To the same effect is *Wolfe v. Howes, supra* (20 N. Y. 197), where one was hired to work in a glass factory for a year at $40 a month, $10 of which was to be paid monthly. He died before the year was up and it was held that recovery could be had for compensation for the time that he worked. It was contended that full performance was a condition precedent to recovery, but the court held the test was what was the intention of the parties. It is there said (p. 200): "It has undoubtedly been long settled as a general principle, both in England and in this as well as in most the other States, that where the contract is entire, nothing but the default of the defendants will excuse performance. It will be found, however, on an examination of the leading cases in our own courts, that the failure to perform was owing to the fault or negligence of the party seeking to recover. (Citing cases.) It is believed that not a single case can be found where the rule is laid down with such strictness and severity as the defendants' counsel asks for in the present case. . . .

"The great principle upon which the adjudged cases in all the courts is based, is the question, as stated in *McMillan v. Vanderlip,* already cited, What was the

real intention of the parties? The law gives a reasonable construction to all contracts. For instance, in the present case, did the parties intend that the contract should be binding upon the plaintiff's testator in case of unavoidable sickness or death; or did they intend, and is it to be implied, that each should perform, as to the other, according to the terms of the contract, *Deo volente?* It appears that a fair and legal interpretation would answer this question in the affirmative, and that such a provision must be understood as written in the contract. Nor is this principle wanting sanction either by elementary writers or adjudged cases. 'Where the performance of a condition is prevented by the act of God, it is excused.' '' And continuing, the court quoting from Story on Bailments (pp. 201, 202) said that ''where the contract is for personal services which none but the promisor can perform, there inevitable accident or the act of God will excuse the non-performance, and enable the party to recover upon a *quantum meruit*. . . .

''The conclusion, then, is that where the performance of work and labor is a condition precedent to entitle the party to recover, a fulfillment must. be shown; yet that where performance is prevented or rendered impossible by the sickness or death of the party, a recovery may be had for the labor actually done. This is not out of harmony with principle or adjudged cases, and is certainly in harmony with the rules of common honesty and strict justice.''

. We do not stop to discuss all the other authorities cited, but the holding in them is to the same effect. We think it sufficient to refer to the case of *Buccini v. Paterno Const. Co.*, 253 N. Y. 256, opinion by Chief Judge Cardoza. In that case ''Buccini made a contract with the Paterno Construction Company to decorate the ballroom, banquet hall and swimming pool in a dwelling described as 'Paterno's Castle' on Riverside Drive in the city of New York.'' The work called

for artistic skill and there was a provision that it should be done by Buccini personally. He died while the work was in progress. After his death a controversy arose as to what, if anything, was due for the work performed by Buccini. The court said (pp. 257, 258): "The contract being personal, the effect of his death was to terminate the duty of going forward with performance, but to leave the owner liable for benefits received. (*Wolfe v. Howes,* 20 N. Y. 197. . . . 3 Williston on Contracts, sec. 1973.)" The contract provided that all questions that might arise in the performance of the work should be submitted to arbitration; and continuing, the court said: "We think the controversy as to the value is within the range of that provision. Into every contract of personal service the law reads 'the implied condition' that sickness or death shall be an excuse for non-performance. . . . The parties may say by their contract what compensation shall be made in the event of that excuse. The award will then conform to the expression of their will. They may leave the subject open, to be governed by the law itself. The award will then conform to the principles of liability in *quasi*-contract and to the considerations of equity and justice by which that liability is governed. In either event the controversy is one that has its origin in the contract and in the performance of the work thereunder, just as much as if the work had been completed under a contract silent as to price, and the controversy had relation to the reasonable value. Death of the contractor has not nullified the contract in the sense of emancipating the claimant from the restraint of its conditions. They limit her at every turn. She cannot stir a step without reference to the contract, nor profit by a dollar without adherence to its covenants (cf. *Reeder v. Sayre,* 70 N. Y. 180, 184). The interrupted work may have been better than any called for by the plans. Even so, there can be no recovery if the contractor wilfully and without

excuse has substituted something else. . . . The value proportionately distributed may be greater than the contract price. Even so, the price, and not the value, will be the maximum beyond which the judgment may not go. . . . The question to be determined is not the value of the work considered by itself and unrelated to the contract. The question to be determined is the benefit to the owner in advancement of the ends to be promoted by the contract.

"Stress is laid by the owner upon a term of the agreement whereby payments are to be made at the rate of '75% of the value of the work installed as the work progresses,' and whereby the owner is to determine the amount due when such payments are requested. This provision is inapplicable to the case that has arisen. It has in view the continuing fulfillment of the contract and requests for part payment while performance is in progress. It has no bearing upon a situation where through death or disability of one party or of both, the duty of performance has been ended without the fault of either."

Under the contract before us we hold that the contingency of Robert White's death before the termination of the period fixed in the contract was not contemplated by the parties and there was no provision covering his compensation in such a contingency; but, as Judge Cardoza says in the case above quoted from, it "cannot exceed the contract price, or the rate of it for the part of the service performed," as prescribed by the contract.

Defendants' affidavit of merits sets up a legal defense and it was error to strike it.

The judgment of the municipal court of Chicago is reversed and the cause remanded for further proceedings in accordance with the views of this opinion.

*Reversed and remanded.*

McSURELY, J., concurs.

MATCHETT, P. J., dissents.